IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BONNIE JO LAMONT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 09 C 1640 |
| v. | ) | |
| | ) | Magistrate Judge Nan R. Nolan |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Bonnie Jo Lamont filed this action seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("SSA"). 42 U.S.C. §§ 416, 423(d), 1381a. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and have filed cross-motions for summary judgment. For the reasons stated below, this case is remanded for further proceedings consistent with this opinion.

## I. THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits ("DIB") or Supplemental Security Income ("SSI") under Titles II and XVI of the SSA,[1] a claimant must establish that he

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq*. The SSI regulations are virtually identical to the DIB regulations and are set forth at 20 C.F.R. § 416.901 *et seq*.

or she is disabled within the meaning of the SSA. *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001); *Keener v. Astrue*, No. 06 C 0928, 2008 WL 687132, at *1 (S.D. Ill. 2008). A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520, 416.909, 416.920; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on February 11, 2005, alleging she became disabled on December 1, 1998, due to cyclothymia[2] and bipolar disorder. (R. at 27, 109, 111, 126.) The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 27, 75–78, 101.)

On July 10, 2007, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge ("ALJ"). (R. at 27, 37–74.) The ALJ also heard testimony from James Breen, a vocational expert ("VE").[3] (*Id.*)

The ALJ denied Plaintiff's request for benefits on September 21, 2007. (R. at 27–36.) Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since December 1, 1998, her alleged onset date. (*Id.* at 29.) At step two, the ALJ found that Plaintiff's history of a bipolar disorder and a history of substance abuse are severe impairments. (*Id.* at 30) At step three, the ALJ determined that Plaintiff's impairments did not meet or medically equal the severity of any of the listings enumerated in the regulations. (*Id.*)

The ALJ then assessed Plaintiff's residual functional capacity ("RFC")[4] and determined that Plaintiff has the RFC to

---

[2] Cyclothymia "is characterized by hypomanic and mini-depressive periods that last a few days, follow an irregular course, and are less severe then in bipolar disorder." *The Merck Manual of Diagnosis and Therapy* [hereinafter *Merck Manual*] 1716 (18th ed. 2006).

[3] The hearing transcript refers to the VE as "Green." (*Compare* R. at 37, 38, 70 *with id.* at 27.)

[4] "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008).

perform a full range of work at all exertional levels but with the following nonexertional limitations: [Plaintiff], as a result of her moderate limitations related to her bipolar disorder and history of substance abuse, is limited to unskilled work and only occasional contact with the public, co-workers and supervisors.

(R. at 31.) Based on Plaintiff's RFC and the VE's testimony, the ALJ determined at step four that Plaintiff could not perform any past relevant work. (*Id.* at 35.) At step five, based on Plaintiff's RFC, her vocational factors and the VE's testimony, the ALJ determined that there are jobs that exist in significant numbers in the regional economy that Plaintiff can perform, including work as a warehouse worker, janitor, housekeeper, handpacker, eye glass assembler, and small products assembler. (*Id.* at 36.) Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability as defined by the SSA. (*Id.*)

The Appeals Council denied Plaintiff's request for review on May 13, 2008. (R. at 12–15.) Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

## III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's

task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing 20 C.F.R. § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. DISCUSSION

### A. The Relevant Medical Evidence

On December 17, 2001, Plaintiff complained of depression, stating to Jennifer McGowan, M.D. that she has been depressed for a "long time." (R. at 511.) She reported "spurts" of depression, poor concentration and anxiety. (*Id.*) Although Plain-

tiff had been previously prescribed Zoloft and Lithium, she was not presently taking any medications for her depression. (*Id.*) Dr. McGowan observed "pressured"[5] and "quick" speech, poor concentration, and anxiety/mania. (*Id.*) She prescribed Paxil and recommended counseling.[6] (*Id.*)

On February 15, 2002, Plaintiff reported that she had stopped using Paxil because of fatigue and drowsiness. (R. at 513.) On examination, Dr. McGowan observed erythema and hives (*id.* at 511), which are serious side effects from taking Paxil, *see* MedlinePlus. She diagnosed depression, mild to moderate, discontinued Paxil and prescribed Zoloft. (R. at 513.)

On October 9, 2004, Plaintiff walked into the emergency room at Good Samaritan Hospital complaining of depression and polysubstance abuse. (R. at 234.) She reported being unemployed and homeless, after selling her home to pay for her alcohol and cocaine addictions. (*Id.*) She had been diagnosed with bipolar disorder six years prior and prescribed Lithium, but presently she did not have a prescription. (*Id.* at 237.) The examining doctor observed that depression and suicidal ideation was present. (*Id.* at 234.) On discharge, Plaintiff was diagnosed with polypharmacy abuse and depression with a history of bipolar disorder and anxiety. (*Id.* at 230.)

---

[5] Pressured speech "is a tendency to speak rapidly and frenziedly, as if motivated by an urgency not apparent to the listener. The speech produced . . . is difficult to interrupt and may be too fast or too tangential for the listener to understand; it is an example of cluttered speech. It can be unrelating, loud and without pauses. It is a hallmark of mania and is often seen during manic periods in patients with bipolar disorder. The pace of the speech indicates an underlying thought disorder known as 'flight of ideas' where the information going through the person's head is so fast that it is difficult to follow their train of thought." <http://en.wikipedia.org/wiki/Pressure_of_speech> (last visited Feb. 1, 2012).

[6] Paxil is used to treat depression, panic disorder, and social anxiety disorder. <www.nlm.nih.gov/medlineplus> [hereinafter MedlinePlus].

Plaintiff began treating with the DuPage County Health Department in October 2004. (R. at 410.) On October 11, 2004, Susan P. Levine, M.D., conducted a psychiatric crisis evaluation. (*Id.* at 226–27.) Plaintiff reported cyclical manic/depression mood changes since the age of 13 and a family history of bipolar disorder and alcoholism. (*Id.* at 227.) Dr. Levine found Plaintiff's mood depressed and her affect sad but appropriate. She diagnosed bipolar disorder, mixed, alcohol dependence and cocaine dependence. (*Id.* at 226.) Dr. Levine prescribed Depakote[7] and asked Plaintiff to return in two weeks. (*Id.*)

On October 25, 2004, Plaintiff reported being alcohol and drug free for 19 days. (R. at 226.) However, she noticed no improvement in her mood with Depakote and had begun getting hives.[8] (*Id.*) Benadryl was prescribed to counteract the hives. (*Id.* at 225.) Plaintiff failed to make her November 8, 2004 appointment and did not call. (*Id.*) On December 13, 2004, Plaintiff reported being drug free but acknowledged drinking alcohol on one day, although it did not feel good. (*Id.*) She reported being anxious in general but stated that the Depakote keeps her calmer. (*Id.*) Plaintiff stated that she no longer had hives but was now experiencing photophobia and blurred vision.[9] (*Id.*) Dr. Levine concluded that Plaintiff's mood was better but "not entirely stable." (*Id.* at 224.)

---

[7] Depakote is an anticonvulsant that is used to treat mania in people with bipolar disorder. *See* MedlinePlus.

[8] Hives are a serious side effect from using Depakote. *See* MedlinePlus.

[9] Photophobia is an abnormal light sensitivity or intolerance. *Merck Manual* 881. Photophobia and blurred vision are known side effects of Depakote. *See* MedlinePlus.

On January 14, 2005, an adult clinical evaluation was performed.[10] (R. at 192–98.) The evaluation revealed that Plaintiff was attempting to cope with many psychosocial stressors, including custody/placement issues, homelessness, illnesses, legal problems, substance abuse, unemployment, and financial problems. (*Id.* at 192.) On examination, Plaintiff exhibited fair insight, depressed and anxious mood, hyperactive motor activity, spontaneous speech, circumstantial thought process, mildly impaired judgment, impaired remote memory, and good to fair problem solving. (*Id.* at 195.)

Plaintiff began treating with psychiatrist Todd H. Kasdan, M.D. on January 27, 2005. (R. at 219.) Plaintiff described a history of symptoms that Dr. Kasdan found were "consistent with depressive episodes consisting of sad mood, insomnia, low energy level, difficulties with concentration, increased appetite, anhedonia,[11] and withdrawn type behavior/feelings." (*Id.*) Plaintiff also described anxiety and symptoms consistent with "hypomanic to manic type episodes consisting of extremely high energy with low number of hours of sleep, extreme distractibility, increased goal directed activity, racing thoughts, talking fast, and impulsivity (in terms of money, purchasing of cars and spur of the moment vacations)." (*Id.*) While these symptoms are consistent with alcohol and drug dependence, Plaintiff reported that these mood and anxiety symptoms occur not only when she is intoxicated but also when she is abstinent. (*Id.*) On examination, Dr. Kasdan found Plaintiff's mood

---

[10] Although the evaluation was initially performed by Robyn Norman, a licensed clinical professional counselor, Plaintiff's treating physician reviewed and approved the evaluation on February 24, 2005. (R. at 198.)

[11] Anhedonia is a "loss of interest or pleasure in usual activities." *Merck Manual* 1705.

mildly irritable, thought process circumferential to logical and sequential,[12] and concentration fair. (*Id.* at 220). He diagnosed bipolar disorder, mixed; alcohol dependence; cocaine dependence, in early full remission; and cannabis abuse. (*Id.* at 221.) Dr. Kasdan assigned a Global Assessment of Functioning ("GAF") score of 51–55.[13] (*Id.*) Despite experiencing side effects like blurred vision, hair loss and weight gain, Plaintiff elected to continue on Depakote. (*Id.* at 219, 221.)

On February 10, 2005, Plaintiff reported an increase in outside psychosocial stress. (R. at 216.) She continued to experience side effects from the Depakote, including blurred vision, hair loss and weight gain. (*Id.*) On examination, Dr. Kasdan found Plaintiff's mood mildly irritable to euthymic and her thought process circumferential to logical and sequential. (*Id.*) Because of the side effects and the "lack of even low partial [therapeutic] response," Dr. Kasdan discontinued Depakote and prescribed Lamictal.[14] (*Id.* at 217.)

On February 24, 2005, Plaintiff reported continued psychosocial stressors—homelessness, lack of funds—and vision problems from her medication.[15] (R. at

---

[12] Circumferential thought process is where the patient starts to get lost, but eventually returns to convey the original idea. <http://quizlet.com/5864542/boards-psych-flash-cards/> (last visited Feb. 1, 2012).

[13] The GAF includes a scale ranging from 0–100, and indicates a "clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Rev. 2000) (hereinafter DSM-IV). A GAF score of 51–60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* at 34.

[14] Lamictal is used to increase the time between episodes of depression, mania, and other abnormal moods in patients with bipolar disorder. *See* MedlinePlus.

[15] Blurred and double vision are known side effects from using Lamictal. *See* MedlinePlus.

213.) On examination, Dr. Kasdan noted both depressive and hypomanic/manic symptoms, as well as general anxiety. (*Id.*) He found Plaintiff's mood mildly irritable to dysphoric to euthymic, her thought process intact to circumstantial, and assigned a GAF score of 50–55.[16] (*Id.* at 214–15.)

On March 11, 2005, Dr. Kasdan found that Plaintiff's response to her medication had worsened. (R. at 211.) Despite continued abstinence from drugs and alcohol, Plaintiff's speech was normal to pressured, mood normal to euphoric, thought process circumstantial, judgment mildly impaired, insight fair, and problem solving fair. (*Id.*) Dr. Kasdan concluded that Plaintiff's symptoms were being exacerbated by economic, healthcare, occupational, social/environmental, support group, and housing stressors. (*Id.* at 212.) He assigned a GAF score of 40–50,[17] and prescribed Tegretol.[18] (*Id.*)

On March 17, 2005, Plaintiff reported mild drowsiness from the Tegretol. (R. at 208.) Despite her improved therapeutic response to the Tegretol (*id.*), Dr. Kasdan concluded that her near term ability to work was "poor" (*id.* at 191).

> She suffers from severe mood instability and difficulty managing everyday stressors. Her judgment and insight are significantly impaired.

---

[16] A GAF score of 41–50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). DSM IV at 34.

[17] A GAF score of 31–40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). DSM IV at 34.

[18] Tegretol is used to treat episodes of mania or mixed episodes in patients with bipolar disorder. *See* MedlinePlus.

> Her affective instability severely interferes with her ability to make productive decisions.

(*Id.* at 191.) While Dr. Kasdan opined that while Plaintiff may be able to work in the distant future,

> her current mood instability, homeless situation and lack of resources make it highly improbable that she will be able to get on her feet quickly, even with the appropriate medication regimen. . . . Her prognosis for employment in the near future is very poor, given her complete lack of resources, coping skills and family support.

(Id.)

On April 14, 2005, Plaintiff described mild mixed mood type symptoms, which may have decreased in intensity but were nonetheless still present and bothersome. (R. at 386.) She reported no side effects from the Tegretol, which she reported taking as prescribed. (*Id.*) Dr. Kasdan described Plaintiff's mood as euthymic to mildly irritable and her thought process as mildly circumferential. (*Id.*) On April 28, 2005, Plaintiff reported a sad and irritable mood, crying spells, and racing thoughts. (*Id.* at 384.) Dr. Kasdan increased her Tegretol dosage in the hopes of seeing a fuller symptom response. (*Id.*) On May 12, 2005, Plaintiff's mood was euthymic, her affect congruent, and her thought process circumferential to logical and sequential. (*Id.* at 383.) Dr. Kasdan again increased her Tegretol dosage, hoping for a more positive symptom response. (*Id.*)

On May 26, 2005, Plaintiff reported racing thoughts and verbose talking. (R. at 380). Dr. Kasdan observed mild pressured speech and plus/minus distractibility. (*Id.*) He found her mood euthymic to mildly elevated, affect congruent, and thought process circumferential to logical and sequential. Dr. Kasdan diagnosed bipolar disorder, mixed but more on the hypomanic side, and polysubstance dependence, in

early full remission. (*Id.*) On June 23, 2005, Plaintiff reported that she had taken a part time job driving a cab. (*Id.* at 377.) The stress of working enough hours to pay for the cab lease caused her to lose sleep, miss her AA meetings, and not socialize. (*Id.*)

On July 7, 2005, Plaintiff reported that she had discontinued her medication because it makes her feel "doped up, it really pushes down." (R. at 375.) She described continued psychosocial stressors associated with driving the cab, including an erratic schedule and poor sleep hygiene. (*Id.*) Dr. Kasdan found Plaintiff to be exhibiting hypomanic symptoms but failed to convince her to take her medications. (*Id.* at 375–76.) On July 20, 2005, Plaintiff reported functioning at an euthymic level the previous several days. (*Id.* at 373.) Dr. Kasdan diagnosed bipolar disorder, history of mixed, presently inter-episode. (*Id.*) He explained to Plaintiff that mood disorders do have inter-episode periods but she remained resistant and not interested in taking her medications. (*Id.* at 374.)

On August 10, 2005, Plaintiff reported increasingly intense depressive symptoms, including sadness, low energy, poor concentration, increasing appetite, and anxiety. (R. at 371.) She continued to maintain her abstinence from drugs and alcohol. (*Id.*) Dr. Kasdan found her mood dysphoric and revised his diagnosis from bipolar disorder to mood disorder NOS. (*Id.*) He prescribed Lexapro,[19] which Plaintiff agreed to try, and scheduled a follow-up visit in two weeks. (*Id.* at 372.) Plaintiff did not show for her August 25, 2005 appointment, nor did she call to cancel or re-

---

[19] Lexapro is used to treat depression and generalized anxiety disorder. *See* Medline-Plus.

schedule. (*Id.* at 370.) On September 8, 2005, Plaintiff reported that the psychosocial stressors associated with driving the cab caused her to have a brief drug relapse. (*Id.* at 367.) Dr. Kasdan restarted her Lexapro prescription, doubling the dosage. (*Id.* at 368.)

On September 22, 2005, Plaintiff reported increasing mood swings, "more on the down side, but also up too." (R. at 365.) Dr. Kasdan found that her symptoms described "mixed mood symptoms, more on the depressed side (main complaints are sad and irritable mood, initial insomnia, racing thoughts, and restlessness)." (*Id.*) He diagnosed mood disorder NOS, but leaning more towards bipolar II disorder, depressed. (*Id.*) Dr. Kasdan maintained her current dosage of Lexapro, added Lithobid,[20] and scheduled a follow-up visit in two weeks. (*Id.* at 365–66.)

Plaintiff failed to show for her next three appointments with Dr. Kasdan. (R. at 362–64.) On November 17, 2005, Plaintiff reported on and off mixed mood symptoms. (*Id.* at 360.) Dr. Kasdan found her mood euthymic but mildly anxious and continued her medication regimen. (*Id.* at 360–61.) On December 7, 2005, Dr. Kasdan revised Plaintiff's diagnosis to bipolar II disorder. (*Id.* at 358.) On December 28, 2005, Plaintiff reported on and off mixed mood type symptoms, short-lived and infrequent, but nonetheless bothersome. (*Id.* at 356.) Dr. Kasdan increased her Lithobid dosage. (*Id.*) Plaintiff missed her next appointment. (*Id.* at 355.) On January 19, 2006, Plaintiff reported that she had failed to get her new Lithobid prescription filled. (*Id.* at 353.) Plaintiff again missed her follow-up appointment. (*Id.* at 351.)

---

[20] Lithobid is a brand name for Lithium, which is used to treat and prevent episodes of mania in people with bipolar disorder. *See* MedlinePlus.

On February 16, 2006, Plaintiff admitted relapsing several times with crack cocaine over the previous two weeks. (R. at 350.) She reported abruptly quitting her job when she abandoned her cab in the middle of the Tri-State Tollway after her employer refused to help her repair a flat tire. (*Id.*; *see id.* at 61.) Consequently, she lost her apartment and became homeless, staying at a shelter. (*Id.* at 350.) She described on and off mixed mood type symptoms and general vague anxiety. (*Id.*) Dr. Kasdan found her mood mildly irritable and mildly dysphoric and her thought process circumferential to logical and sequential. (*Id.*) He diagnosed bipolar II disorder, mixed, but more on the low side.

On March 2, 2006, Plaintiff reported decreased mixed mood type symptom intensity but noticed the onset of racing thoughts, restlessness, and insomnia. (R. at 348.) Dr. Kasdan concluded that she was showing a good anxiety symptom response to her medication but only a partial response to her mood symptoms. (*Id.*) He increased her nighttime Lithobid dosage. (*Id.* at 349.)

On March 16, 2006, Plaintiff reported mixed mood type symptoms turning more towards the hypomanic side and increasing in intensity. (R. at 345.) She described an increasingly irritable mood, higher energy level with less sleep, restlessness, distractibility, racing thoughts, and loud talking. (*Id.*) Plaintiff reported taking her medications as prescribed and maintaining abstinence from alcohol and drugs. (*Id.*) Dr. Kasdan diagnosed bipolar II disorder, with symptoms more on the hypomanic side, and deceased her Lexapro dosage. (*Id.* at 345, 347.) By March 23, 2006, Plaintiff's symptoms were "under better control." (*Id.* at 343.)

On April 6, 2006, Plaintiff reported that her mixed mood symptoms were of mild intensity and decreasing but experiencing insomnia, low energy levels and an inability to concentrate. (R. at 341.) Dr. Kasdan altered Plaintiff's Lithobid dosage and initiated a Trazodone trial.[21] (*Id.* at 342.) On April 20, 2006, Plaintiff described an onset/recurrence of mixed mood type symptoms and a mild increase in anxiety. (*Id.* at 339.) Dr. Kasdan increased her Trazodone dosage. (*Id.* at 340.) On May 4, 2006, Plaintiff described her continued stress of being homeless, taking care of her asthma, and worrying about her ex-husband's health. (*Id.* at 337.) Nevertheless, she reported that her mixed mood type symptoms were under control and her anxiety manageable. (*Id.*)

On May 19, 2006, Dr. Kasdan opined that Plaintiff is still unable to maintain employment. (R. at 410–11.) He detailed his conclusions:

> [Plaintiff] is disabled with the diagnoses of Bipolar II Disorder. Her impaired ability to attend and concentrate, coupled with an inability to cope with ordinary emotional demands of daily living have resulted in her being unable to maintain part or full-time employment for many years.
>
> [Plaintiff] has been homeless for over two years. She has made several attempts to support herself with part-time situations but has been unable to tolerate the stress and ends up leaving the job situations precipitously. Her affective instability severely interferes with her ability to cope with occupational challenges. . . . Her homeless situation and lack of transportation makes it virtually impossible for her to have consistent follow up with her therapist or to take advantage of skill training opportunities that would help her out of her current situation. Since childhood she reports that she has struggled with relating appropriately to authority figures, family, significant others and friends because of being unable to manage her intense mood swings. . . . *She has extremely limited ability to manage herself successfully when she*

---

[21] Trazodone is an antidepressant, but Dr. Kasdan prescribed it off label to counteract Plaintiff's insomnia. (R. at 342.)

> *experiences either depressive or manic symptoms*. . . . Her prognosis for
> maintaining employment is very poor until she has her survival needs
> met, and is gainfully employed.

(*Id.* at 410) (emphasis added).

On June 22, 2006, Plaintiff stated that despite her chaotic housing situation, she was maintaining abstinence and relative stability. (R. at 429.) On June 27, 2006, Plaintiff presented with psychosocial stressors related to her difficulty finding temporary housing. (*Id.* at 427.) Between June 28 and July 11, 2006, Plaintiff missed several appointments with her case manager. (*Id.* at 420–26.) On July 21, 2006, Plaintiff reported constant headaches and general malaise. (*Id.* at 418.) On August 11, 2006, she described difficulty sleeping and racing thoughts. (*Id.* at 416, 508.)

On August 15, 2006, Plaintiff's case manager at the DuPage County Health Department completed a report detailing Plaintiff's impairments. (R. at 413–14.) By this point, Plaintiff had been participating in therapy one to two times a week for almost two years. (*Id.* at 413.) The report indicated that Plaintiff becomes very irritable with people wanting things from her and is easily frustrated. (*Id.*) She cannot go into a shopping mall without getting overly stimulated. (*Id.*) She has alienated herself from her family, including her children, because of her chaotic behavior. (*Id.*) The report concluded that Plaintiff demonstrates poor insight and judgment, cannot socialize with healthy individuals, and is unable to concentrate. (*Id.* at 413–14.) Further, the report opined that Plaintiff is unable to perform sustained work because of her irritability, volatility, and inconsistent mood. (*Id.* at 414.)

On August 16, 2006, Plaintiff's therapist observed her being irritable to other clients. (R. at 507.) On August 17, 2006, Plaintiff presented with symptoms of hy-

pomania—racing thoughts and pressured speech. (*Id.* at 454, 506.) She reported maintaining abstinence from alcohol and illicit drugs and taking her medications as prescribed. (*Id.*) Dr. Kasdan found her though process circumferential and her speech verbose. (*Id.*) He diagnosed bipolar II disorder, possible beginnings of hypomania, and discontinued Lexapro. (*Id.* at 454–55.) On August 29, 2006, Plaintiff reported that she has racing thoughts, which she frequently and inadvertently verbalizes. (*Id.* at 504.) On September 6, 2006, Plaintiff presented with a mildly elevated mood, circumferential thought process, and verbose speech. (*Id.* at 452.) On September 7, 2006, Plaintiff was irritable and hyperverbal. (*Id.* at 502.) On September 8, 2006, Plaintiff reported having memory problems. (*Id.* at 501.)

On September 20, 2006, Plaintiff reported a decrease in hypomanic symptoms, denied any depressive symptoms, but noticed an increase in anxiety. (R. at 450.) Dr. Kasdan found her mood to be mildly anxious and her though process mildly circumferential. (*Id.*) He diagnosed bipolar II disorder and anxiety disorder NOS, and restarted her on a low dose of Lexapro. (*Id.* at 450–51.)

On September 26, 2006, Plaintiff acknowledged to her therapist that she should attend anger management classes after blowing up at a shelter employee. (R. at 497–98.) On October 10, 2006, Plaintiff admitted to irritating people on purpose and finding it funny. (*Id.* at 495.) On October 11, 2006, Plaintiff reported "on and off periods of mood irritability 'where [she] picks on other people, while [she's] doing it [she] know[s] [she] shouldn't be doing it and [she] could stop but it seems like fun.'" (*Id.* at 448.) Dr. Kasdan increased her Lithobid dosage. (*Id.* at 449.) On October 17

and 19, 2006, Plaintiff complained of trouble sleeping and extreme racing thoughts. (*Id.* at 491–92.)

On October 25, 2006, Plaintiff reported feeling "revved up;" she was unable to sleep at night and has no energy during the day. (R. at 446.) She described feeling hyper, depressed and generally anxious. (*Id.*) Dr. Kasdan found her mood mildly elevated, thought process circumferential to logical and sequential, and speech slightly verbose. (*Id.*) He diagnosed bipolar II disorder, currently on the hypomanic side slightly, and anxiety order NOS. (*Id.*) Dr. Kasdan altered her Lithobid and Trazodone dosages and discontinued Lexapro. (*Id.* at 447.) The next day, Plaintiff was crying, and reported insomnia and roving thoughts. (*Id.* at 490.)

By November 8, 2006, Plaintiff's mixed mood symptoms were unchanged. (R. at 444.) Dr. Kasdan again found her mood mildly elevated, thought process circumferential to logical and sequential, and speech slightly verbose. (*Id.*) He discontinued Trazodone because it was no longer helping her insomnia, decreased her Lithobid dosage, and initiated a Seroquel trial.[22] (*Id.* at 445.) On November 22, 2006, Plaintiff presented with an early positive partial response to the Seroquel; she reported improvements in her mixed mood/hypomanic symptoms and negligible anxiety. (*Id.* at 442.) Dr. Kasdan slightly increased her Seroquel dosage. (*Id.* at 443.) Over the next several months, Plaintiff's symptoms generally appeared to be under control. (*Id.* at 433–40.)

---

[22] Seroquel is used alone or with other medications to treat or prevent episodes of mania. *See* MedlinePlus.

However, on November 28, 2006, Plaintiff reported feeling depressed. (R. at 483.) On January 16, 18 and 25, 2007, Plaintiff complained of trouble sleeping. (*Id.* at 474–76.) On March 8, 2007, Plaintiff was hyperverbal, possibly due to an increase in caffeine consumption. (*Id.* at 467.) On May 3, 2007, Plaintiff reported feeling lonely and depressed. (*Id.* at 460.) On May 22, 2007, Plaintiff complained of problems falling asleep and feeling isolated. (*Id.* at 457.)

On May 31, 2007, Plaintiff reported no new psychosocial stressors and that she was maintaining abstinence from alcohol and illicit drugs. (R. at 431.) Nevertheless, she described on/off mixed mood symptoms, insomnia and hypnagogic/hypnopompic hallucinations.[23] (*Id.*) She discussed possible/questionable post-traumatic events endured as young child. (*Id.*) Dr. Kasdan increased Plaintiff's Seroquel dosage. (*Id.*)

At her hearing, Plaintiff testified that her bipolar disorder caused her trouble at work. (R. at 44.) She had trouble concentrating and ended up delegating much of her work. (*Id.*) When it became apparent to Plaintiff that her bipolar disorder was interfering with her ability to work, she elected to work part-time for a couple years. (*Id.*) When she could not even manage part-time work, her employer laid her off. (*Id.*)

Plaintiff testified that although her medications provide her some relief, most days she experiences mixed moods—both depression and mania. (R. at 48.) When she is in a depressed state, she is not motivated to do anything. (*Id.* at 55.)

---

[23] Hypnagogic hallucinations are particularly vivid auditory or visual hallucinations that occur when just falling asleep. *Merck Manual* 1841. Hypnopompic hallucinations occur as one is waking up. <http://www.medterms.com>

> I just lay around and I don't do anything, and I don't get out of my pajamas, and I don't take a shower, and I don't, I probably will eat. Most of the time I'll eat, but nothing too elaborate. And, it's not like, it's not like not wanting to do anything, or to face anything, and I'm overwhelmed and just not I'm not like doing anything.

(*Id.* at 62–63.) She also has difficulty thinking, concentrating and focusing, and experiences feelings of low self-esteem. (*Id.* at 51.)

> But it's also, it's a mix with the manic also because like later I can get up and zoom, zoom try to make some dinner, and I get really creative and uses spices and whatever, whatever, you know what I mean, like that. And then within the next morning I can't get up. Let's say I can't get out of bed. I don't want to get out of bed. I think why should I get up.

(*Id.*) During these periods, Plaintiff would likely miss significant days of work.

> Because I wouldn't want to get up. Because there would be days I couldn't get up. I would be too overwhelmed. I would be too overwhelmed to do it, like the million things you have to do before you leave the house. And then, then to, I, and I just don't think so. Maybe, I don't know. . . . I couldn't, sometimes I can't do stuff. I mean sometimes I just can't, it would be too overwhelming. I couldn't. Not all the time. I mean like sometimes I can't even go outside. And it doesn't matter what's waiting out there for me, you know.

(*Id.* at 66–67.)

When Plaintiff is in a manic state, she can go days without sleeping. (R. at 62.)

> [A]ll of a sudden you get this like, all of sudden this tremendous energy to I could clean a closet, I could vacuum the floor, I could you know, make a big dinner for me, you know. It's just, and then I now there's something about it, I mean it's always in the evening because then it goes into midnight. And that's when I finally have to take that pill to stop it. That's when I get all those racing thoughts and I have to pretty much, I have to stop it again.

(*Id.*) She also experiences periods of verbosity.

> I talk a lot. Sometimes it's kind of confusing. I mean it's, it doesn't make sense. Like I can start to almost not like make sense, I know. And, manic and than I don't eat. Don't eat. Don't sleep.

(*Id.*) Plaintiff testified that she has trouble sleeping because of racing thoughts. (*Id.* at 54.) While she denied having hallucinations, she stated:

> I do see these lights. I do have these weird things that happen. I don't call them hallucinations, not really. But there's something that is definitely happening with [me], and it has something to do with the light. [It's] a light and some of the darkness and some kind of weird shadow thing.

(*Id.* at 51–52.)

As for activities of daily living, Plaintiff testified that while she is able to occasionally cook, do dishes and laundry, and go grocery shopping, she does not do them consistently. (R. at 63–64.) Her standards are fairly low. (*Id.* at 64.)

> If I'm really manic, it might be a better job. But otherwise, no. If I have to vacuum, if I, this was like I spill a box of cereal on the floor it could sit there for three days. Then I'll come through and I'll pick it up. Yes, [if you went to my house today, you would see dishes in the sink.] You would see laundry piled on the floor, and crumbs all under like where I eat, like when I sit on the couch, it's like crumbs . . . and stuff.

(Id.)

Plaintiff testified that she has problems getting along with other people, especially in public. (R. at 64–65.) This was especially a problem with her daycare business and when she was working as a taxicab driver. (*Id.* at 65.) She has a difficult time keeping her mouth shut, which could lead to verbal altercations with supervisors. (*Id.* at 65–66.)

## B. Analysis

Plaintiff raises five arguments in support of her request to reverse and remand: (1) the ALJ's step two determination was erroneous; (2) the ALJ's step three analysis was erroneous; (3) the ALJ's RFC determination was erroneous; (4) the ALJ's

credibility determination was patently wrong; and (5) the ALJ's step five determination was erroneous. (Mot. 1, 6–15.) The Court addresses each argument in turn.

### 1. *Plaintiff's Credibility*

Plaintiff contends that the ALJ erred in discounting her testimony about the nature and extent of her ailments. (Mot. 14.) She asserts that the ALJ's credibility determination is "meaningless boilerplate." (*Id.*)

In determining credibility, "an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c); Social Security Ruling ("SSR")[24] 96-7p. An ALJ may not discredit a claimant's testimony about her symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing SSR 96-7p; 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("The administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). If a claimant's symptoms are not supported by medical evidence, the ALJ may not ignore available evidence. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 540 (7th Cir. 2003). Indeed, SSR 96-7p requires the ALJ to con-

---

[24] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000) (citations omitted); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administering." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

sider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p.

The Court will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). The ALJ's decision "must contain specific reasons for a credibility finding; the ALJ may not simply recite the factors that are described in the regulations." *Steele*, 290 F.3d at 942 (citation omitted); *see* SSR 96-7p. "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele*, 290 F.3d at 942.

In her decision, the ALJ made the following credibility determination:

> The record shoes that there are significant discrepancies between [Plaintiff's] testimony itself and the statements contained in the medical record. [Plaintiff] stated that she stopped working as a result of her bipolar symptoms, but acknowledged that she was laid off when her employer downsized in 1998. She has alleged back pain, but admitted at the hearing to having no difficulties with household chores and stated that she could walk one mile. [Plaintiff] and her attorney have alleged that [Plaintiff] would be unable to work because of an anger problem, that is, she would be unable to get along with people. [Plaintiff] did not allege in her testimony that she has difficulties in the areas where she lives, in interacting with others when she attends community meetings or when she uses public transportation. Additionally, [Plaintiff] worked as a cab driver in 2005 and 2006. She has stated that she worked up to 20 hours a day at that job. She did not testify that she had any ongoing problems in dealing with or relating to the people in that job.

*     *     *

> After careful consideration of the entire record, the undersigned finds
> that [Plaintiff's] medically determinable impairments could reasonably
> be expected to produce the alleged symptoms, but that [Plaintiff's]
> statements concerning the intensity, persistence and limiting effects of
> these symptoms are not entirely credible.

(R. at 32–33, 34.)

The ALJ's analysis is mere boilerplate that "yields no clue to what weight the trier of fact gave [Plaintiff's] testimony." *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) (reviewing similar language and finding that "[i]t is not only boilerplate; it is meaningless boilerplate[; t]he statement by a trier of fact that a witness's testimony is 'not *entirely* credible' yields no clue to what weight the trier of fact gave the testimony"); *see Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787–88 (7th Cir. 2003) ("This is precisely the kind of conclusory determination SSR 96-7p prohibits. Indeed, the apparently post-hoc statement turns the credibility determination process on its head by finding statements that support the ruling credible and rejecting those statements that do not, rather than evaluating the Brindisis' credibility as an initial matter in order to come to a decision on the merits."). The ALJ does not explain which of Plaintiff's allegations were credible, which were incredible, or provide reasoning in support of her findings. *See Groneman v. Barnhart*, No. 06 C 0523, 2007 WL 781750, at *11 (N.D. Ill. March 9, 2007) ("The ALJ may have provided a *reason* for rejecting [claimant's] allegations—because he did not seek treatment and follow through with medication—but he did not provide *reasoning*."). The ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make

clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, at *2.

Under the circumstances, none of the reasons provided by the ALJ for rejecting Plaintiff's credibility are legally sufficient or supported by substantial evidence. First, the ALJ expressed doubt about Plaintiff's credibility because she has no difficulties with household chores and is able to walk one mile. (R. at 32.) But Plaintiff did not testify that she is totally incapacitated; indeed, she testified that she has good days and bad days. (*Id.* at 48.) When she is in a manic state, she can get a lot done. (*Id.* at 51.) However, when she is in a depressed state, she has difficulty thinking, concentrating and focusing, and experiences feelings of low self-esteem— she is not motivated to do anything. (*Id.* at 51, 55.) Plaintiff testified that while she is able to do cooking, dishes and laundry, and go grocery shopping, she doesn't do them consistently. (*Id.* at 63–64.) Her standards are fairly low—some days she leaves dishes stacked in the sink, laundry piled on the floor, crumbs left where she had been eating. (*Id.* at 64.) "The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . ., and is not held to a minimum standard of performance, as she would be by an employer." *Bjornson v. Astrue*, — F.3d —, No. 11-2422, 2012 WL 280736, at *6 (7th Cir. Jan. 31, 2012) ("The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.").

Second, the ALJ erred in dismissing Plaintiff's testimony that anger issues would interfere with her ability to work. The ALJ asserted that Plaintiff did not allege that she had any problems getting along with people in the area where she lives, in interacting with others when she attends community meetings or when she uses public transportation. (R. at 32.) But Plaintiff did not testify that she had trouble getting along with everyone; instead, her anger is associated primarily with the psychosocial stressors incumbent in employment situations, especially with supervisors. (*Id.* at 65–66; *see id.* at 61, 350, 367.) Thus, Plaintiff acknowledged getting along with her customers when she was driving the taxi but not with her supervisors. (*Id.* at 61.) On two occasions, she became so angry with her supervisors that she abruptly quit. (*Id.*) The first time she left the cab "at the office, like I just parked and ditched it." (*Id.*) The second time, she abandoned her cab in the middle of the Tri-State Tollway after her employer refused to help her repair a flat tire. (*Id.* at 61, 350.) Further, the record is replete with references to her anger issues. (*Id.* at 214–15 (Plaintiff presented to her doctor with irritable mood), 216 (same), 219 (same), 345 (same), 350 (same), 365 (same), 384 (same), 386 (same), 502 (same), 410 (Plaintiff relates inappropriately to authority figures because she is unable to manager her intense mood swings), 413 (Plaintiff gets very irritated with people wanting things from her and is easily frustrated), 414 (case manager opining that Plaintiff is unable to work because of her irritability, volatility and inconsistent mood), 448 (Plaintiff admitted to irritating people on purpose), 495 (same), 497–98 (Plaintiff requested anger management classes after blowing up at a homeless shelter

employee), 507 (Plaintiff's therapist observed her being irritable to other patients).) The ALJ cannot discuss only those portions of the record that support her opinion. *See Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) ("An ALJ may not selectively consider medical reports, especially those of treating physicians, but must consider all relevant evidence. It is not enough for the ALJ to address mere portions of a doctor's report.") (citations omitted); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ cannot disregard medical evidence simply because it is at odds with the ALJ's own unqualified opinion.").

Third, the ALJ has distorted the record. The ALJ claimed that Plaintiff "stated that she stopped working as a result of her bipolar symptoms, but acknowledged that she was laid off when her employer downsized in 1998." (R. at 32.) In fact, Plaintiff testified that when it became apparent that her bipolar disorder was interfering with her ability to work, she agreed to work part-time. (*Id.* at 44.) After a couple years, when she could not even manage part-time work, her employer laid her off as part of a restructuring. (*Id.*) The ALJ also asserted that Plaintiff complained of back pain but admitted to being able to walk one mile and having no difficulties with household chores. (R. at 32.) But Plaintiff testified that her back pain was recent—within the past six months—and that she can no longer walk the mile to the bus stop or do household chores without taking frequent breaks. (*Id.* at 52, 56, 59.)

Finally, the ALJ failed to thoroughly discuss the SSR 96-7p factors. "In determining credibility an ALJ must consider several factors, including the claimant's

daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c)(3); SSR 96-7p, at *3. While the ALJ briefly mentioned Plaintiff's daily activities (R. at 32), the ALJ did not provided any reasoning as to whether these daily activities support or undermine Plaintiff's credibility,[25] *see Steele*, 290 F.3d at 941–42 ("According to Social Security Ruling 96-7p, . . . the evaluation must contain 'specific reasons' for a credibility finding; the ALJ may not simply 'recite the factors that are described in the regulations.' Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed."). The ALJ's failure to analyze these factors warrants reversal. *See Villano*, 556 F.3d at 562 (because "the ALJ did not analyze the factors required under SSR 96-7p," "the ALJ failed to build a logical bridge between the evidence and his conclusion that [claimant's] testimony was not credible").

On remand, the ALJ shall reevaluate Plaintiff's complaints with due regard for the full range of medical evidence. *See Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001).

### 2. *Mental Limitations*

Plaintiff contends that the ALJ failed to give controlling weight to the opinion of Dr. Kasdan, her treating psychiatrist. (Mot. 13–14.) She argues that the ALJ ig-

---

[25] For example, the ALJ stated that Plaintiff "spends her days . . . writing a story on her computer (R. at 32), but failed to mention that this activity had been specifically recommended by her therapist (*id.* at 471).

nored a significant body of evidence from Dr. Kasdan. (*Id.* 13.) Plaintiff also asserts that the ALJ failed to demonstrate that Dr. Kasdan's opinion was contradicted by anything else in the medical record. (*Id.* 14.)

By rule, "in determining whether a claimant is entitled to Social Security disability benefits, special weight is accorded opinions of the claimant's treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2); *accord Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). An ALJ should bear in mind that a treating physician typically has a better opportunity to judge a claimant's limitations than a nontreating physician. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); *Grindle v. Sullivan*, 774 F. Supp. 1501, 1507–08 (N.D. Ill. 1991). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). An ALJ "must offer 'good reasons' for discounting a treating physician's opinion." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2); other citation omitted). An "ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Id.*

An ALJ may not make an independent medical finding, substituting his own opinion of the medical evidence for that of the claimant's treating physician. *Rohan v. Chater*, 98 F.3d 966, 970–71 (7th Cir. 1996); *see Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006) ("Obviously if [the treating physician's medical opinion] is well supported and there is no contradictory evidence, there is no basis on which the administrative law judge, who is not a physician, could refuse to accept it."). If conflicting medical evidence is present, however, it is the ALJ's responsibility to resolve the conflict. *Books*, 91 F.3d at 979 (ALJ must decide which doctor to believe). An ALJ may reject the opinion of a treating physician in favor of the opinion of a nontreating physician in some cases, particularly where the nontreating physician has special expertise that pertains to the case and where the issue is one of interpretation of records or results rather than one of judgment based on observations over a period of time. *Micus v. Bowen*, 979 F.2d 602, 608 (7th Cir. 1992) ("[I]t is up to the ALJ to decide which doctor to believe—the treating physician who has experience and knowledge of the case, but may be biased, or . . . the consulting physician, who may bring expertise and knowledge of similar cases—subject only to the requirement that the ALJ's decision be supported by substantial evidence."); *Hofslien*, 439 F.3d at 377 ("So the weight properly to be given to testimony or other evidence of a treating physician depends on circumstances."). Thus, the testimony of a medical advisor may be given substantial weight, even if the advisor did not personally examine the claimant. *DeFrancesco v. Bowen*, 867 F.2d 1040 (7th Cir. 1989).

Nevertheless, even if the ALJ determines that a treating physician's opinion should not be afforded controlling weight, she must explicitly decide what weight to give that opinion. *Campbell*, 627 F.3d at 308. Accordingly, "if an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss*, 555 F.3d at 561; *see* 20 C.F.R. § 404.1527. In sum, "whenever an ALJ does reject a treating source's opinion, a sound explanation must be given for that decision." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)).

In her decision, the ALJ found that Dr. Kasdan's opinion was not entitled to significant weight:

> The opinion of Dr. Kasdan, that [Plaintiff] is unable to perform any work is . . . not entitled to significant weight. . . . [T]here are many inconsistencies between the treatment notes and this opinion. [Plaintiff's] own testimony as to her activities, her abilities and her history of driving a cab when she needed income, reveals that the opinion that [Plaintiff] is incapable of any work, is not supported by the record as a whole.

(R. at 34–35.)

Under the circumstances, none of the reasons provided by the ALJ for rejecting Dr. Kasdan's opinion are legally sufficient or supported by substantial evidence. First, the ALJ erred in concluding that Plaintiff's brief employment as a cab driver casts doubt on Dr. Kasdan's opinion that Plaintiff's prognosis for being able to work is poor. (R. at 35.) On the contrary, a claimant's "unsuccessful attempts to pursue various vocations might just as easily provide corroboration that her impairments

significantly limited her ability to work, as opposed to evidence that her ability was greater than she alleged." *McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011); *see also Kangail v. Barnhart*, 454 F.3d 627, 629–30 (7th Cir. 2006) (explaining that a claimant who can hold a job only for a short period of time because of her impairment is not capable of substantial gainful activity). The ALJ did not consider the possibility that Plaintiff's ill-fated employment experience as a cab driver *supports* rather than *undermines* Dr. Kasdan's opinion. In fact, there is no evidence in the record to contradict his opinion that Plaintiff "has made several attempts to support herself with part-time situations but has been unable to tolerate the stress and ends up leaving the job situations precipitously. Her affective instability severely interferes with her ability to cope with occupational challenges." (R. at 410.)

Second, the ALJ does not explain how Plaintiff's nonwork related activities and abilities equate into an ability to perform fulltime work. (R. at 35.) By cherry-picking the medical file, the ALJ demonstrates a fundamental misunderstanding of mental illness; a person who suffers from depression or anxiety will have good days and bad days. *See Punzio*, 630 F.3d at 710 ("But by cherry-picking Dr. Mahmood's file to locate a single treatment note that purportedly undermines her overall assessment of Punzio's functional limitations, the ALJ demonstrated a fundamental, but regrettably all-too-common, misunderstanding of mental illness. As we have explained before, a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition.") (citations omitted); *see also Bauer*, 532 F.3d at 609 ("A person who has a

chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days; that is true of the plaintiff in this case. Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job."). Further, the ALJ has not explained how Plaintiff's "ability to take care of all her own needs and to be significantly functional" (R. at 34), equates to an ability to work. *See* Bjornson, 2012 WL 280736, at *6 ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . ., and is not held to a minimum standard of performance, as she would be by an employer.").

Third, the ALJ erred in criticizing Dr. Kasdan's opinion for failing to "describe [Plaintiff's] symptoms and limitations due to the bipolar disorder." (R. at 33.) While Dr. Kasdan's March 17, 2005 report—which was a letter directed "To Whom It May Concern" (*id.* at 191)—may not have elaborated on his diagnosis, the medical records contain myriad descriptions of Plaintiff's symptoms and limitations (*see*, *e.g.*, *id.* at 511 (December 2, 2001 report of pressured and quick speech, poor concentration, and anxiety/mania with note that Plaintiff had suffered from depression for a "long time"), 513 (February 15, 2002 diagnosis of depression, mild to moderate), 230–37 (October 9, 2004 diagnosis of depression with history of bipolar disorder and anxiety), 226 (December 13, 2004 diagnosis of bipolar disorder, mixed, and alcohol and cocaine dependence), 192–92 (January 14, 2005 clinical evaluation), 219–21

(January 27, 2005 diagnosis of bipolar disorder, assigning GAF score of 51–55, and describing symptoms and drug side effects, including blurred vision), 216–17 (February 10, 2005 examination describing symptoms and drug side effects, including blurred vision), 213–15 (February 24, 2005 examination describing symptoms and psychosocial stressors and assigning GAF score of 50–55), 211–12 (March 11, 2005 examination describing worsening symptoms and psychosocial stressors and assigning GAF score of 40–50)). The ALJ cannot discuss only those portions of the treating physician's reports that support his opinion. *See Myles*, 582 F.3d at 678 ("An ALJ may not selectively consider medical reports, especially those of treating physicians, but must consider all relevant evidence. It is not enough for the ALJ to address mere portions of a doctor's report.") (citations omitted); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ cannot disregard medical evidence simply because it is at odds with the ALJ's own unqualified opinion.").

Similarly, the ALJ erred by complaining that Dr. Kasdan "makes no mention of [Plaintiff's] long history of substance abuse in [the March 2005] report." (R. at 33.) Again, the ALJ ignores Dr. Kasdan's medical records, which duly note Plaintiff's struggles with alcohol and drug dependence. (*See*, *e.g.*, *id.* at 219–21 (diagnosing alcohol dependence; cocaine dependence, in early full remission; and cannabis abuse).) In any event, by finding that Plaintiff, "when she maintains sobriety, has the ability to perform unskilled work" (*id.* at 34), the ALJ has put the cart before the horse.

"When an applicant for disability benefits both has a potentially disabling illness and is a substance abuser, the issue for the administrative law judge is whether, were the applicant not a substance abuser, she would still be disabled." *Kangail v. Barnhart*, 454 F.3d 627, 628 (7th Cir. 2006); *see* 20 C.F.R. § 404.1535(b)(1) ("The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol."). If the ALJ finds that the claimant would still be disabled if she stopped using drugs or alcohol, "she is deemed disabled 'independent of [her] drug addiction or alcoholism' and is therefore entitled to benefits." *Kangail*, 454 F.3d at 629 (quoting 20 C.F.R. § 404.1535(b)(2)(ii)). Thus, the ALJ must *first* determine whether the claimant is disabled under the five-step analysis *before* determining which physical or mental limitations would remain if the claimant stopped using drugs or alcohol. *Hart v. Astrue*, No. 11 C 0043, 2012 WL 639530, at *3 (N.D. Ind. Feb. 27, 2012); *see Kangail*, 454 F.3d at 629; *Harlin v. Astrue*, 424 F. App'x 564, 567 (7th Cir. 2011). Here, the ALJ muddled the two distinct steps together. (R. at 33–34.) Even if the substance abuse aggravated Plaintiff's bipolar disorder, it does not prove that she is not disabled. *Kangail*, 454 F.3d at 629. Further, "bipolar disorder can precipitate substance abuse, for example as a means by which the sufferer tries to alleviate her symptoms."[26] *Id.*

---

[26] Similarly, Plaintiff's inability to keep appointments with her doctors and counselors (*see, e.g.*, R. at 351, 370), "is both a symptom of her mental illness and an aggravating factor," *Punzio*, 630 F.3d at 711.

Fourth, the ALJ failed to account for why Plaintiff stopped taking her medications. (R. at 34 ("The treatment records reveal that over the years, [Plaintiff] has been resistant to maintaining her prescribed treatment medications.").) Mental patients "are often incapable of taking their prescribed medications consistently." *Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011). A common consequence of bipolar disorder is for the patient to take her medications during her depressive episodes but not during her manic periods. *Id.*; (*see* R. at 373–76). Further, with many of her medications, Plaintiff was experiencing serious side effects. (*See, e.g.*, R. at 219–21 (blurred vision, hair loss, weight gain), 216 (same), 213 (blurred and double vision), 225 (photophobia and blurred vision), 226 (hives), 342 (insomnia), 446 (same), 490 (same), 474–76 (same), 511 (erythema and hives).) In fact, the medical record clearly demonstrates that Dr. Kasdan—who saw Plaintiff on a weekly to monthly basis beginning in January 2005—was constantly trying to find the right combination of drugs to combat her mental illnesses, with limited success. (*See, e.g.*, *id.* at 221 (diagnosing bipolar disorder, mixed, and electing to continue Plaintiff on Depakote), 217 (discontinuing Depakote because of side effects and lack of even low, partial, therapeutic response, and prescribing Lamictal), 212 (adding Tegretol), 384 (increasing Tegretol dosage), 383 (same), 373 (diagnosing bipolar disorder, history of mixed, presently inter-episode), 368 (restarting Lexapro prescription, doubling the dosage), 365–66 (diagnosing mood disorder NOS, but leaning more towards bipolar II disorder, depressed, and prescribing Lithobid), 358 (diagnosing bipolar II disorder), 350 (diagnosing bipolar disorder II, mixed), 349 (increasing Lithobid dosage),

347 (decreasing Lexapro dosage), 342 (altering Lithobid dosage and initiating Trazodone trial), 340 (increasing Trazodone dosage), 454–55 (diagnosing bipolar II disorder, possible beginnings of hypomania, and discontinuing Lexapro), 450–51 (diagnosing bipolar II disorder and anxiety disorder NOS, and restarting a low dose of Lexapro), 449 (increasing Lithobid dosage), 447 (altering Lithobid and Trazodone dosages and discontinuing Lexapro), 445 (discontinuing Trazodone and initiating Seroquel trial), 443 (increasing Seroquel dosage), 431 (same).)

Finally, even if the ALJ had provided good reasons for not giving controlling weight to Dr. Kasdan's opinions, she failed to decide what weight to give them. *See Campbell*, 627 F.3d at 308 ("Even if an ALJ gives good reasons for not giving controlling weight to a treating physician's opinion, she has to decide what weight to give that opinion."); *Punzio*, 630 F.3d at 710 ("And whenever an ALJ does reject a treating source's opinion, a sound explanation must be given for that decision."). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss*, 555 F.3d at 561; *see* 20 C.F.R. § 404.1527. Here, the ALJ did not explicitly address the checklist of factors as applied to the medical opinion evidence. *See Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (criticizing the ALJ's decision which "said nothing regarding this required checklist of factors"); *Bauer*, 532 F.3d at 608 (stating that when the treating physician's opinion is not given controlling weight "the

checklist comes into play"). And many of the factors support the conclusion that Dr. Kasdan's opinion should be given great weight: he treated Plaintiff on a weekly or monthly basis for at least 28 months; he is a psychiatrist; and his findings remained relatively consistent throughout the course of Plaintiff's treatment. "Proper consideration of these factors may have caused the ALJ to accord greater weight to [Dr. Kasdan's] opinion." *Campbell*, 627 F.3d at 308.

On remand, the ALJ shall reevaluate the weight to be afforded Dr. Kasdan's opinions—both the one on March 17, 2005, and the one 14 months later on May 19, 2006. (*See* R. at 191, 410–11.) If the ALJ finds "good reasons" for not giving Dr. Kasdan's opinions controlling weight, *see Campbell*, 627 F.3d at 306, the ALJ shall explicitly "consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion," *Moss*, 555 F.3d at 561, in determining what weight to give Dr. Kasdan's opinions.[27]

---

[27] Plaintiff asserts that the ALJ erred in finding her asthma, vision disorder, sciatica, and hypothyroidism nonsevere. (Mot. 6–9.) But the ALJ found that Plaintiff's history of bipolar disorder and substance abuse were severe and moved on to step 3. (R. at 30.) In assessing Plaintiff's RFC, the ALJ must consider both severe and nonsevere impairments. *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003) ("Having found that one or more of [the claimant's] impairments was 'severe,' the ALJ needed to consider the *aggregate* effect of the entire constellation of ailments—including those impairments that in isolation are not severe."). Thus, even if the ALJ improperly found Plaintiff's asthma, vision disorder, sciatica, and hypothyroidism nonsevere, it was "of no consequence with respect to the outcome of the case." *Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010).

At step 3, Plaintiff argues that the ALJ did not consider the combined effect of her physical and mental limitations in determining whether her ailments met or equaled a Listing. (Mot. 9–11.) However, Plaintiff has not met her burden of establishing what Listing(s) she meets or equals. *See Ribaudo v. Barnhart*, 458 F.3d 580, 583–84 (7th Cir. 2006); *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999). Plaintiff also asserts that the ALJ failed to consider the "A" criteria in assessing her bipolar disorder under Listing 12.04. (R.

## C. Summary

In sum, the ALJ has failed to "build an accurate and logical bridge from the evidence to her conclusion." *Steele*, 290 F.3d at 941 (internal quotation omitted). This prevents the court from assessing the validity of the ALJ's findings and providing meaningful judicial review. *See Scott*, 297 F.3d at 595. For the reasons set forth herein, the ALJ's decision is not supported by substantial evidence. On remand, the ALJ shall reevaluate the weight to be afforded Dr. Kasdan's opinions, explicitly addressing the required checklist of factors. The ALJ shall reassess Plaintiff's credibility with due regard for the full range of medical evidence. The ALJ shall then reevaluate Plaintiff's mental and physical impairments and RFC, considering all of the evidence of record, including Plaintiff's testimony, and shall explain the basis of her findings in accordance with applicable regulations and rulings. In formulating hypothetical questions to the VE, the ALJ "must include all limitations supported by medical evidence in the record." *Steele*, 290 F.3d at 942.

## V. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Doc. 40] is **GRANTED**, and Defendant's Motion for Summary Judgment [Doc. 41] is

---

at 10.) But it appears that the ALJ assumed that the "A" criteria were met and concluded that Listing 12.04 did not apply because Plaintiff failed to meet the "B" criteria. (*Id.* at 30–31.)

Plaintiff contends that the ALJ erred in failing to consider her physical impairments and her obesity. (Mot. 11–14.) But Plaintiff did not assert any physical impairments (*see* R. at 126), and has not met her burden to demonstrate how any of her alleged physical impairments, including her obesity, were limiting (*see* Mot. 11–14); *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006; *Hernandez v. Astrue*, 277 F. App'x 617, 624 (7th Cir. 2008).

**DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: March 19, 2012

NAN R. NOLAN
United States Magistrate Judge